[No. 13468-7-III.   Division Three.   May 4, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. RODERICK L. BAILEY, JR., *Petitioner*.

*William D. Edelblute,* for petitioner.

*James Kaufman, Prosecuting Attorney,* and *Denis P. Tracy, Deputy,* for respondent.

*Gary P. Burleson, Prosecuting Attorney for Mason County,* and *George A. Steele, Deputy; James R. Sweetser, Prosecuting Attorney for Spokane County,* and *Patricia A. Thompson, Deputy; Russell D. Hauge, Prosecuting Attorney for Kitsap County,* and *Greg R. Hubbard, Deputy,* amici curiae for respondent.

THOMPSON, C.J. — Roderick L. Bailey, Jr., seeks discretionary review of his conviction as an accomplice for hunting, controlling and possessing a big game species out of

season. RCW 77.16.020. He assigns error to several jury instructions, challenges the sufficiency of the evidence and contends the statute under which he was charged was unconstitutionally vague and deprived him of equal protection. We reverse.

## FACTS

On October 12, 1991, Joshua Phillip Thompson, his brother Warren Thompson, and Blaine Duty were hunting in southern Whitman County. Mr. Bailey was their hired guide. The hunting party came upon a wounded mule deer buck with two antler points. Joshua Thompson shot and killed the deer, although it was in Game Management Unit 142, Almota, an area restricted to the hunting of bucks with three or more antler points.

The 2-point buck was skinned and tagged, as were two other deer Warren Thompson and Blaine Duty killed earlier that day. The deer were loaded onto a truck Mr. Bailey had borrowed. As the three were leaving the area, they were stopped by wildlife agents acting on information relayed to them by other hunters. Although the group had agreed to give false information as to where the buck was shot, they eventually admitted the actual location to the agents. The illegal deer was confiscated.

Testimony at trial established that Mr. Bailey and the others knew the injured deer was in an area with a 3-point antler restriction. According to Mr. Bailey, Mr. Thompson shot the injured deer because it was suffering. Mr. Duty said they did not want to see the injured deer suffer and go to waste.

Mr. Thompson testified he was in the back of the truck watching the wounded deer while the others were in the cab talking about what they should do. He said Mr. Bailey got on the CB radio, although he could not tell to whom he was talking. After Mr. Bailey got off the radio, Mr. Thompson said he heard the others mumbling and then his brother yelled at him to "go ahead and shoot" it. He said he thought about it for about a second, then shot the deer.

Mr. Thompson said he did not recall Mr. Bailey telling him to shoot the deer. However, in a statement made the day

of the shooting, he recalled Mr. Bailey saying, "Go ahead and put it down". Mr. Thompson explained at trial: "I couldn't hear them say the words, but I heard, all of them looking at Warren telling him to tell me to go ahead . . .". Mr. Bailey denied telling Mr. Thompson to kill the deer. He said he called the owners of the property where the deer was shot on the CB, but made no attempt to contact the Department of Wildlife.

A wildlife agent testified that when the Department gets information about a wounded game animal on its 800 number, or through the State Patrol or other means, it responds. If the animal is fatally wounded, an agent will kill it.

The jury found Mr. Bailey guilty. He appealed to Superior Court where his conviction was affirmed. We granted discretionary review.

### Jury Instructions

We address first Mr. Bailey's contention the trial court erred in giving jury instructions 6, 7, 12 and 13. He contends the instructions misstated the law and were not supported by sufficient evidence.

Instruction 6 states that a person "commits the crime of Taking Big Game Species Out of Season when he or she hunts, possesses, or controls an animal of a species of big game in an area [Unit 142] which is closed to the taking of that animal". Instruction 12 defines a closed area as "a place where the hunting of some species, or part of a species, of wild animal or wild bird is prohibited". Instruction 13 states that on the day the deer was shot, it was in an area closed to the taking of 2-point buck deer. Instruction 7 states in part:

> To convict the defendant of the crime of accomplice to taking a big game animal out of season, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 12th day of October, 1991, Josh Thompson hunted, possessed, or controlled an animal of a species of big game in an area which was closed to the taking of that animal;
>
> (2) That the defendant acted as an accomplice to Josh Thompson in the commission of this crime; and
>
> (3) That the acts occurred in Whitman County, Washington.

Mr. Bailey contends that while the possession and hunting of deer with less than three antler points in Unit 142 violated WAC 232-28-226 and RCW 77.21.010(2), it did not violate RCW 77.16.020(1). WAC 232-28-226 established the antler point minimum for buck deer during the 1991-1992 hunting season and RCW 77.21.010(2) made it a misdemeanor to violate those rules. RCW 77.16.020(1), on the other hand, makes it unlawful to hunt or possess a "species of . . . game animal . . . during the closed season for that species . . .". Mr. Bailey argues that because the number of antler points on a game animal does not determine what species it belongs to, violation of an antler point rule is not a violation of RCW 77.16.020(1). We agree.

There is no statutory definition of the term "species".[1] Although a "technical" term, an ordinary dictionary definition of species is not that dissimilar from an acceptable biological definition. *Compare Webster's Third New International Dictionary* 2187 (1969), which defines species as "a group of intimately related and physically similar organisms that actually or potentially interbreed and are less commonly capable of fertile interbreeding with members of other groups . . ." *with* Sandra Holmes, *Henderson's Dictionary of Biological Terms* 403 (9th ed. 1979), which defines species as "a group of interbreeding individuals not interbreeding with another such group, being a taxonomic unit including geographical races and varieties and having 2 names in binomial nomenclature, the generic name and specific epithet, similar and related species being grouped into a genus". Both definitions point out that the potential for interbreeding within the group and the unlikelihood of interbreeding outside the group are critical to the meaning of the term.

■■ In plain language, RCW 77.16.020(1) prohibits hunting, controlling or possessing a species during a closed season for that species. A season is open or closed in terms of time, place and manner of taking. RCW 77.08.010(10), (11).

---

[1]There is a definition of species in WAC 232-12-297(2.7). However, it simply defines species as "any group of animals classified as a species or subspecies as commonly accepted by the scientific community".

The time, place and manner of taking game animals is established by the Wildlife Commission. RCW 77.12.040. The Wildlife Commission also has authority to adopt and enforce reasonable rules regulating the quantities, species, sex and size of game animals that may be taken or possessed.[2] RCW 77.12.040. Consequently, if the Commission specifies October 15 to November 30 as open season for mule deer in a specified game management area, the hunting, controlling or possessing of a mule deer on December 1 is a violation of RCW 77.16.020(1) because the season is closed "for that species" on December 1. If, on the other hand, the Commission specifies that same time period for hunting, controlling or possessing mule deer, but limits the sex to males only, and limits the size to a minimum of three antler points, the hunting, possessing or controlling of a mule deer buck with two antler points on November 30 does not violate RCW 77.16.020(1) because the season is not closed for the species mule deer. However, violation of the Commission's antler restriction is a misdemeanor under RCW 77.21.010(2).[3]

■ We do not find RCW 77.16.020(1) ambiguous. When a statute is not ambiguous, the Legislature's intent must be determined by the language of the statute alone. *State v. Johnson*, 119 Wn.2d 167, 172, 829 P.2d 1082 (1992). If the Legislature intended RCW 77.16.020(1) to prohibit hunting or possessing a species of game animal based on its size, it could have stated so, just as RCW 77.16.020(2) states that killing or taking game animals in excess of quantity restrictions for each species (*i.e.*, bag limits) is prohibited.

---

[2]Ordinarily, game rules are adopted by the Commission on an emergency basis as temporary rules. They are filed with the code reviser's office and printed in pamphlet form for public availability. WAC 232-24-120, Reviser's note.

[3]Pursuant to RCW 77.21.010(2), a person violating game rules is guilty of a misdemeanor, unless a greater punishment is imposed by statute:

A person violating or failing to comply with this title or rules adopted pursuant to this title for which no penalty is otherwise provided is guilty of a misdemeanor and shall be punished for each offense by a fine of five hundred dollars or by imprisonment for not more than ninety days in the county jail or by both the fine and imprisonment. The commission may provide, when not inconsistent with applicable statutes, that violation of a specific rule is an infraction under chapter 7.84 RCW.

The State calls our attention to *State v. Rhodes*, 58 Wn. App. 913, 795 P.2d 724 (1990). *Rhodes* held that notwithstanding the language of RCW 77.16.020(1), hunting a "doe deer" during a time when the Commission designated hunting only "buck deer" violated RCW 77.16.020(1) based on "applicable principles of statutory construction" and the Legislature's intent when it amended the former game code in 1955. *Rhodes*, at 918.

According to *Rhodes*, the term "species" was added to RCW 77.16.020(1) in 1980 to modernize it, not to change its meaning. With all due respect, we do not agree with *Rhodes* conclusion or its reliance on various principles of statutory construction to determine legislative intent when the statutory language is clear. The term "species" was not a modern term in 1955 when the former game code was amended, or in 1947 when the amended statute was enacted. Nor do we believe the Legislature misunderstood the term.[4] A "doe deer" is not a species distinct from a "buck deer", anymore than a 3-point mule deer is a species distinct from a 2-point mule deer.

We conclude that the challenged instructions misstate the law. RCW 77.16.020(1) refers to a closed season "for that species", while instructions 6 and 7 refer to a closed season for "that animal". RCW 77.08.010(12) defines a closed area as "a place where the hunting of some species of wild animals . . . is prohibited", while instruction 12 defines a closed area as a place where hunting "some species" or "part of a species" is prohibited and instruction 13 states that Unit 142 was closed in terms of antler point restrictions.

Even if the jury instructions had correctly stated the law, there was no evidence to support a violation of RCW 77.16-

---

[4]The fish and wildlife laws are replete with references to the term "species". *See, e.g.*, RCW 77.08.030 (big game defined by species); RCW 77.08.020 (game fish defined by species); RCW 77.12.020 (habits and distribution of species to be investigated and a determination made whether a species should be managed); RCW 77.16.020(2) (prohibition against exceeding bag limits for a species). The fish and wildlife laws also contain frequent references to the scientific and common names of various species, such as "odocoileus hemionus", the scientific name for "blacktail deer or mule deer" and "cervus canadensis" the scientific name for "elk or wapiti". RCW 77.08.030.

.020(1). Mr. Bailey was improperly charged, tried and convicted under that statute. Therefore, his conviction is reversed and dismissed.

## NECESSITY DEFENSE

■ The jury was given a necessity defense instruction based on testimony that Mr. Thompson shot the deer to prevent it from prolonged suffering. The State contends the necessity defense is unavailable for violations of RCW 77.16.020(1). Although Mr. Bailey's conviction is reversed and dismissed, we address the issue because it is of public importance and likely to arise again. We are assisted in our analysis by amicus curiae.

The necessity defense issue arises as a result of Mr. Bailey's assignment of error to instruction 16, which he contends prejudiced his necessity defense. That instruction states: "State Wildlife Agents have legal authority to kill fatally wounded deer in an area normally closed to the taking of such deer."

The State contends the instruction is supported by RCW 77.12.240[5] and even if not, it was harmless error to give it because it was relevant only to Mr. Bailey's necessity defense and that defense should not have been allowed.

■■ The necessity defense may be asserted by a defendant

> when the physical forces of nature or the pressure of circumstances cause the accused to take unlawful action to avoid a harm which social policy deems greater than the harm resulting from a violation of the law. The defense is not applicable . . . where a legal alternative is available to the accused.

*State v. Diana*, 24 Wn. App. 908, 913-14, 604 P.2d 1312 (1979).

---

[5]RCW 77.12.240 states that the *director* may authorize the killing of wildlife when necessary for "wildlife management". No evidence was presented at trial to establish that the director exercised this statutory authority. Although a wildlife agent testified that wounded animals were sometimes killed by agents, such testimony alone does not support the giving of instruction 16.

Here, the alleged "pressure" resulted from Mr. Bailey's perceived need to kill the wounded deer as soon as possible to prevent its prolonged suffering.

The rationale of the necessity defense is based on public policy:

[T]he law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law.

Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 50, at 382 (1972).

Courts have recognized the necessity defense in wildlife cases under limited circumstances where wildlife was killed to protect property.[6] However, such cases are of little assistance when the justification for killing is based solely on empathy for the animal being killed. Such justification is strikingly similar to the "mercy killing" defense.

The usual justification for mercy killing is to prevent the unremitting and uncontrollable pain of a dying person. While there are emotional and compassionate arguments for mercy killing as applied to all species, such defense has been rejected for a number of reasons, including its potential for abuse. The case at hand raises the same concern. Even if the hunters were competent to determine whether or when the injured deer would die from its injuries, the opportunities for abuse were enormous. For this reason alone, we conclude the necessity defense was unavailable under the facts of this case.

Even if the necessity defense were available as a defense to the killing of an injured game animal, it is unavailable as a defense to its possession or control. Further, the necessity defense requires proof by a preponderance of evidence that

---

[6]*See, e.g., State v. Burk*, 114 Wash. 370, 195 P. 16, 21 A.L.R. 193 (1921) (necessity defense available to landowner who killed elk to prevent repeated and extensive damage to property, including killing of owner's calf); *Cross v. State*, 370 P.2d 371, 93 A.L.R.2d 1357 (Wyo. 1962) (landowner justified in killing moose out of season to protect property where he had used every remedy available to him before killing the animal and used only such force as was reasonably necessary and suitable to protect property).

there was no legal alternative. *Diana*, at 916; *State v. Gallegos*, 73 Wn. App. 644, 651, 871 P.2d 621 (1994). Here, if Mr. Bailey or Mr. Thompson could have notified the Wildlife Department of the injured deer, but did not, there was a legal alternative to killing it.

We reverse and dismiss.

SWEENEY and SCHULTHEIS, JJ., concur.

After modification, further reconsideration denied June 28, 1995.